In the Matter of the Application of JAMES F. EGAN, Public Administrator of New York County, as Administrator, etc., of EDWARD J. GRAMM, Deceased, to Discover Certain Property of Said Deceased Claimed to Be Withheld.*

WALTER BENSON, Appellant; JAMES F. EGAN, Public Administrator of New York County, as Administrator, etc., of EDWARD J. GRAMM, Deceased, and EMIL GRAMM and Others, Heirs at Law, Respondents.

First Department, May 29, 1936.

* Revg. 157 Misc. 676.

*Abraham Lillienthal* of counsel [*Irving A. Heimlich,* attorney], for the appellant.

*Joseph A. Cox* of counsel [*Joseph T. Arenson* with him on the brief], for the petitioner-respondent.

*Sidney B. Alexander* of counsel [*Meyer Loebelson,* attorney], for the respondents-heirs at law.

TOWNLEY, J.   The decedent Gramm, an unmarried man of about fifty-seven years of age, died at the Veterans' Administration Facility, Bronx, New York, November 2, 1934.   Letters of administration were issued to the public administrator of the county of New York, who brought this discovery proceeding to recover certain bank books which constituted the valuable part of the decedent's estate.   These bank books were in the possession of the appellant Benson.   Benson claimed at the hearings before the surrogate that he held these books as a gift made to him by the decedent *causa mortis.*   The surrogate has disallowed the claim.   The questions presented are whether the elements necessary to constitute a valid gift *causa mortis* were established and, if so, whether the proof was clear and convincing.

Benson was a married man and superintendent of an apartment house at 115 West Eighty-sixth street where he resided.   The

decedent, who lived in a furnished room, was a frequent visitor there. He and the appellant were often seen together and were known as bosom friends. When decedent went to the hospital in his last illness he left from the appellant's home, and appellant's wife accompanied him. At the hospital the decedent gave appellant's name as a person to be notified in the event of an emergency.

The alleged gift was made on October 31, 1934. The witness Ryder testified that on the previous Sunday, October 28, 1934, in his presence while walking in Central Park, the deceased Gramm said to Benson, " In case I should die, I want you to have everything I own." At the time of this conversation the deceased had already suffered a slight stroke and had decided to go to a hospital on the following Wednesday for observation and treatment. He feared that death was approaching. On the morning of the day on which the gift is claimed to have been made, Benson, at Gramm's request, went to his room and assisted him in packing up his property which was removed to Benson's apartment. Certain fishing tackle and other odds and ends were packed and carried over to Benson's house. The decedent accompanied Benson carrying an envelope or briefcase sealed with sealing wax. On his arrival at Benson's apartment, he asked that Benson procure two witnesses and Benson called in one Suderman, superintendent of a neighboring apartment house, and Peter McGlynn, an elevator operator. In the presence of Suderman and McGlynn, the appellant and his wife, the decedent then stated that he wished Suderman and McGlynn to witness that he was turning over an envelope to the appellant; that if he did not return from the hospital he wished the appellant to have it — if he did, it was to be returned to him.

The surrogate based his conclusion upon the testimony of the three witnesses present when the envelope was delivered. This testimony, so far as material, is as follows:

Suderman testified: " Mr. Benson called me into his apartment; he says, ' I want you to meet Mr. Gramm,' and in the apartment at that time was a man by the name of Pete — I don't know his last name — Mr. Benson, Mrs. Benson, Mr. Gramm and myself. Mr. Gramm had an envelope, a rather large black envelope, tied with a string and sealed with sealing wax, red sealing wax. He told us, he says, ' I want you to be a witness to this, that I am giving this envelope to Mr. Benson. I am going to the hospital, and if I come out of the hospital I want Mr. Benson to give it back to me. If I don't, I want Mr. Benson to have it.' Q. Anything else? Have you told us all? Can you think of anything else that was said? A. Well, he said he was — he didn't feel so very well, although he looked very robust to me and healthy.

I wouldn't say he was a sick man. But he said he had had a slight stroke previous to that time, and he wanted to go to the hospital and see what was the matter with him. Q. Did he say anything about what was in the bag? A. No, sir; valuable papers. Q. Did he say that, ' Valuable papers? ' A. Yes, sir."

McGlynn then testified: " When I went into the apartment Mr. Gramm was there, and Mr. Benson and Mr. Suderman, and Mr. Gramm said, ' I want you two men and Mrs. Benson to witness that I am giving this envelope to Mr. Benson. I am going to the hospital. If I don't come back, I want Mr. Benson to have it. If I do come back, I want Mr. Benson to return it to me.' "

Finally, appellant's wife told the story of the occurrence as follows: " I was getting ready to go to the hospital with him, and just as I was ready to go with him he said, ' Walter, I want you to go out and get two witnesses besides your wife,' and so my husband went out, because I think he knew all about it; he told him before, when he went with him to pack, what was going to be, and got Mr. Suderman. He brought in Mr. Suderman and introduced him, and Mr. Suderman never saw him before. Then he went out and got Pete, our service car man there. He came in and Mr. Gramm greeted him. It was time for us to go, and he said, ' Gentlemen,' or something to that effect, he says, ' I have had a slight stroke. I don't know how serious it is, and I was advised to go to the hospital maybe for treatment, maybe — I don't know what,' he says, ' But I want to make sure that I settle all my private estate, whatever belongs to me, I want to settle all up,' and then he said, ' This brief case here, I want to give it to Mr. Benson in case I go to the hospital, something happens to me, I die, I want him to have that, and in case I come back, I want that back.' That was said in a brief way, more or less the same as I said. Q. At the time he said, ' I want him to have that,' did he hand anything? A. Yes. He mentioned — Mr. Cox: If your Honor please, I object to counsel leading. The Surrogate: I must insist now — Mr. Cox: I ask that the answer be stricken out. The Surrogate (continuing) — that you permit the witness to state what the words were and what the acts were, and make no suggestions to her. The Witness: When he handed him that brief case, he says there was his bank books and his investment book in it, all he possessed of any value."

On this testimony the surrogate said that he was satisfied that the sealed envelope had been given and that it was the intention to vest in Benson whatever was in that envelope as a gift *causa mortis*. The question then arose whether there was any proof of what was in it. The surrogate found that so far as the bank

books were concerned, the only one who mentioned them in the testimony was Mrs. Benson. He then declared that her testimony amounted to a contradiction of the other witnesses, that he would not believe her and that he rejected her testimony as a whole including her account of what actually was found in the envelope after Gramm's death. He then found that in the absence of Mrs. Benson's testimony, it was impossible to infer that the bank books had been in the envelope.

We do not agree that Mrs. Benson's testimony should have been rejected as unworthy of belief since it was not in any sense a contradiction but was an amplification of what had occurred. The hearing before the surrogate took place some nine months after the conversations referred to. That the recollection of the witnesses Suderman and McGlynn should be less complete than Mrs. Benson's is readily understandable.

The uncontradicted facts confirm Mrs. Benson's testimony as to the contents of the envelope delivered. The bank books concededly were in the possession of Benson after Gramm's death. They must either have been contained in the envelope which was delivered to him or have been picked up by Benson at the time that he was moving Gramm's things to his apartment. The latter alternative involves the assumption that Gramm had with a formality requiring the presence of three witnesses delivered an envelope containing nothing of value and had left these bank books to be gathered up with his other possessions when he left his furnished room. Gramm was arranging all his affairs against the possibility of his death while in the hospital. It is inconceivable that he should have been so formal about the delivery of nothing of special value and so casual about his bank books. These bank books constituted Gramm's entire estate with the exception of one bank book which he had taken with him to the hospital and which is not involved in this proceeding. Confirmation of Mrs. Benson's story is found in Suderman's testimony that Gramm at the time that the envelope was delivered said that it contained valuable papers. The testimony is further confirmed by the conversation had in the presence of the witness Ryder on the Sunday preceding the delivery of the envelope in which Gramm had said to Benson, " In case I should die, I want you to have everything I own."

Every circumstance connected with this transaction tends to confirm the conclusion that Gramm had formed a deliberate intention to give these bank books to Benson and that his knowledge that the envelope contained practically his entire estate was his reason for asking that its delivery be made in the presence of

witnesses accompanied by a declaration of his intention in connection therewith.

The clear and convincing proof here establishes that Gramm had segregated the documents which he possessed and which he considered of value as his estate in a sealed envelope and delivered it in the presence of witnesses to the beneficiary.

The decree should be reversed, with costs to the appellant payable out of the estate, and a decree should be entered awarding the property to the appellant.

MARTIN, P. J., McAVOY, O'MALLEY and UNTERMYER, JJ., concur.

Decree unanimously reversed, with costs to the appellant payable out of the estate, and the matter remitted to the Surrogate's Court for further action in accordance with opinion.